KUTRAMO v. MICHIGAN BONDING & SURETY CO.

1. Intoxicating Liquors — Civil-Damage Act — Evidence That Plaintiff Had Children Inadmissible.

In an action by a wife against a saloon keeper and his bondsman for damages under the civil-damage act, evidence that the plaintiff had children is inadmissible.

2. Same—Indirect Evidence of Children.

If it was permissible for plaintiff to illustrate or emphasize her distress of mind, by reason of her husband's drinking habits, by the assertion that she contemplated suicide, it was self-evident that she abandoned the project, and it was not permissible for her to explain that she was restrained because she remembered all of her children, thus getting by indirection before the jury the incompetent evidence that she had children.

3. Same—Damages—Excessive Verdict.

Where plaintiff's husband was not shown to have drunk in defendant's place within two days of the time of the accident which caused his death, and for which the jury returned no damages were allowed, a verdict for $6,000, held, excessive when eliminating prospective loss and mental anguish "due to the manner and condition" in which he died, and in view of the fact that plaintiff suffered the shame and humiliation of a drunken husband eight years before defendant first engaged in the saloon business.

Error to Houghton; O'Brien (Patrick H.), J. Submitted April 9, 1920. (Docket No. 37.) Decided June 7, 1920.

Case by Hilda Kutramo against the Michigan Bonding & Surety Company, surety, and Elias Haanpaa, principal, under the civil-damage act. Judgment for plaintiff. Defendants bring error. Reversed.

*A. F. Bunting, S. Wesselius* and *Galbraith & McCormack,* for appellants.

*Le Gendre & MacNally,* for appellee.

STEERE, J. On the evening of July 6, 1917, William Kutramo, a miner of Finnish nationality living near Red Jacket, Michigan, went into a Finnish bathhouse to take a bath and while there fell from one of the benches, or shelves, used in the steam room at such places and fractured his skull, from which accident he died some hours later.

Defendant Elias Haanpaa was at that time and had been for some years running a saloon in the village of Red Jacket largely patronized by Finns. Plaintiff Hilda Kutramo, widow of deceased, brought this action against Haanpaa and his bondsman charging that on various occasions said Haanpaa had, against her protest and notice, unlawfully sold intoxicating liquors to her husband who was addicted to the excessive use of intoxicating liquor and an habitual drunkard, specifically alleging in her declaration:

"That because of the intoxicating liquors sold to said William Kutramo by the said Elias Haanpaa, his clerks, agents and servants on the 6th day of July, A. D. 1917, and at previous times thereto during said liquor years, the said William Kutramo became weak, dazed and helpless, and while in a drunken, weak, dazed and helpless condition, produced by the liquors furnished by the said Elias Haanpaa, and while taking a bath in a bathhouse in Calumet township on the 6th day of July, A. D. 1917, fell from one of the shelves in said bathhouse and fractured his skull, and as a result thereof died on the 7th day of July, A. D. 1917."

The case was tried by jury in the circuit court of Houghton county in April, 1919, resulting in a verdict and judgment in favor of the plaintiff for $6,000. Motion was thereafter made for a new trial on various grounds, including the claim that the verdict was contrary to the weight of evidence and excessive, which

was denied and the case removed to this court for review on numerous assignments of error.

Briefly stated, plaintiff's testimony to support her claim was in outline and substance that she married deceased in 1895; that he was then an industrious, able-bodied man not given to the excessive use of intoxicating liquors, but that in 1899 he began to drink some, at first keeping away from his home when intoxicated, and gradually became more addicted to the use of intoxicating liquors, drinking more and working less steadily, until in 1910 his habits were such that plaintiff caused written notices to be prepared and served by the marshal of the village of Red Jacket upon the saloon keepers of that village, including defendant Haanpaa, forbidding them from selling intoxicating liquors to her husband; that Haanpaa nevertheless permitted deceased to patronize his saloon, and during the three years before his death deceased's intemperance, with resultant neglect and abuse of plaintiff, increased to a marked degree and he became an habitual drunkard; that plaintiff at different times found him drunk or drinking intoxicating liquors at Haanpaa's place during the years 1915-1917, remembering and testifying distinctly to four different dates when such was the case. Other witnesses also testified to deceased getting liquor from defendant on different occasions during that period. It was shown that he drank in Haanpaa's on July 4, 1917, and that he was intoxicated at the time he fell from a shelf in the bathhouse and fractured his skull.

The case was tried for plaintiff on the theory indicated in that portion of her declaration quoted, but the jury seem to have either rejected the theory that Haanpaa was responsible for Kutramo's death, or that it was no loss to plaintiff, in view of the following special questions and answers submitted to and given by them:

"If you find for plaintiff answer the following questions:

"1. At what sum do you assess plaintiff's damages? $6,000.

"2. Do you allow to plaintiff any damages arising or growing out of the death of her husband? None.

"3. If so, how much of the total amount do you allow as damages arising or growing out of the death of plaintiff's husband? None."

Complaint is made of and error assigned on the manner in which the court submitted those questions to the jury with instructions as to how to answer them, as claimed. Of them the court charged the jury:

"The burden of proof is upon the plaintiff to establish by a fair preponderance of the evidence that the death of her husband was contributed to by intoxication and that such intoxication was contributed to by the unlawful sales or furnishing of liquor by defendant Haanpaa to her husband. You heard what I said on that, and bear that in mind. If you find in favor of the plaintiff on that proposition, then you can answer the second question 'Yes.' If you find in favor of the defendant on that proposition, you can answer the question 'No.'

"Now, if you answer the second question 'Yes,' then you answer the third question. If so, how much of the total amount assessed do you allow as damages arising or growing out of the death of plaintiff's husband?

"In other words, how much damages do you allow for the future, after the death of plaintiff's husband, providing you allow any?"

Plaintiff's most pointed reply to the claimed error in manner of submitting special questions is that, if error, defendants cannot complain as the answer was in their favor. On whose request those special questions were submitted does not appear; but in connection with preceding instructions as to how the jury should view that inquiry and the measure of damages given in portions of the charge, their purpose is not

clear. In one paragraph of the quite lengthy charge the jury were instructed as follows:

"I charge you, gentlemen of the jury, that there is no evidence in this case that plaintiff's husband received any liquor from defendant Haanpaa that contributed to any intoxication that was on at the time he met with the accident which resulted in his death, if he was so intoxicated, and you are therefore directed that you cannot award plaintiff any damages for the death of her husband because of any liquor furnished upon the day that he met with the accident."

Following this the court further said upon that subject:

"Now the question of whether or not the defendant Haanpaa can be held responsible for the accident which resulted in the death of plaintiff's husband is a question that I am going to leave to you in this way. It is the theory of the plaintiff that during all these years unlawful sales were made from time to time by defendant to Kutramo; that plaintiff's decedent's condition and habits regarding his drinking grew worse from time to time and that on account of his weakened intellect and general run-down condition, that even if no liquor was sold him on the 6th of July, that nevertheless his previous intoxication occasioned in part (according to the claim of plaintiff) or contributed to by the defendant was one of the contributing factors to his death or to the accident that caused his death. * * * If you find by a fair preponderance of the evidence that there is a relation of cause and effect between unlawful sales, * * * and the accident that resulted in the death of plaintiff's husband, then, gentlemen, you have a right to allow the plaintiff damages for her future loss of support and for injuries to feelings occasioned her by the husband's death."

Somewhat in that connection complaint is made of the extent to which the court stressed the manner of death to the jury as possible element of damages by frequent reference to it, which it is claimed was preju-

dicial and is reflected in the verdict. Running through the lengthy charge the court instructed the jury at different places as to the measure of damages as follows:

"The plaintiff should be allowed reasonable compensation for all loss of support, if any, which she has already sustained, and for all loss of support which it is reasonably certain she will sustain in the future in consequence of the wrongful and unlawful acts of defendant * * * and also for all such shame, humiliation and worry, if any, as has been brought upon her in consequence of such unlawful acts, either by the drunken condition, public exhibition, or otherwise, also the shame or humiliation she may have had due to the manner and condition in which her husband died. You must be governed by the evidence * * * and take into consideration all of such matters shown by the evidence as tends to show past or future loss * * * in means of support, * * * humiliation, worry, if any, which has been brought upon her as a consequence of the intoxicated condition of her husband, and the manner in which he died. * * * The injury to the feelings contemplated by the statute is that resulting from having a drunkard for a husband and not the injury to the feelings occasioned by the accident, * * * on account of there being three liquor years involved there, if during any year or years you are not able to find that liquor was unlawfully sold or furnished by defendant to plaintiff's husband, but you do find that liquor was sold for some other year or years then you find damages accordingly. Your verdict cannot exceed $6,000 if liquor was sold for only two years; it cannot exceed $3,000 if it was only sold during one of the years and a verdict of $9,000 could only be delivered in this case if liquor was sold during the period of 3 years."

Complaint is particularly made of the fact, and manner in which, the jury was informed plaintiff had a family of children, and comment by her counsel in relation to it. This court has repeatedly held it error to introduce before the jury testimony that plaintiff had children. *Larzelere* v. *Kirchgessner*, 73 Mich.

276; *Johnson* v. *Schultz,* 74 Mich. 75; *Thomas* v. *Dansby,* 74 Mich. 398; *Boydan* v. *Haberstumpf,* 129 Mich. 137; *Manzer* v. *Phillips,* 139 Mich. 61; *Montross* v. *Alexander,* 152 Mich. 513; *Pearson* v. *Schoenberg,* 167 Mich. 255; *Rauhala* v. *Maki,* 172 Mich. 112. The reasons for excluding such testimony have been so often and clearly stated in those decisions that it is unnecessary to repeat them here.

The fact was brought to the attention of the jury in the instant case as follows: While being examined by her counsel plaintiff was asked if she remembered anything that happened "due to his drinking," in the summer of 1915 while her husband was drinking heavily, and she replied:

"I remember that very well.
"Q. What do you remember?
"A. I was so distracted when I was working, was so nervous, because I never had nothing; no food or no drink and I didn't know what to do next and I was going to commit suicide."

Objection to this was overruled and she was then asked:

"Q. What steps did you take to do what you just mentioned?"

Allowed to answer this against objection she replied:

"I was going to jump into the Calumet dam, but I remembered all my children and that prevented me."

A motion to strike this answer out was denied and error is assigned upon such ruling.

If it was permissible for her to illustrate or emphasize her distress of mind by the assertion that she contemplated suicide, it was self-evident she abandoned the project, but it was clearly not permissible to thus by indirection get before the jury incompetent evidence as to her excuse or reason for changing her

mind. Such answer could not be anticipated by defendant's counsel, and perhaps was not by plaintiff's counsel, although it is urged for plaintiff as relevant and competent in explanation of why she refrained from the desperate act she contemplated, and the trial court appears to have adopted that view. It stood before the jury with the court's indorsement as competent for them to take into consideration in estimating damages. In *Boydan* v. *Haberstumpf, supra,* the court struck out testimony showing plaintiff had a young child and sought to cure the error by instructions in the charge, but this court not being satisfied the error was without prejudice the case was reversed. In *Manzer* v. *Phillips, supra,* the court said:

"The fact that the testimony was introduced indirectly, instead of directly, in this case, does not alter the rule. The mischief is the same in one case as in the other. * * * We should not be inclined to reverse the case for this error in view of the amount of the judgment—$300—if we were satisfied that the verdict was not affected by the error. But we are satisfied from the testimony of the plaintiff herself that this verdict could only be awarded properly on the basis of damages for injuries to her feelings and exemplary damages, and we therefore hold the admission of this evidence to have been reversible error."

In the instant case the amount of the judgment was $6,000, a sum suggested by the court as permissible, "if liquor was sold for only two years" of the three alleged.

That deceased did work steadily for months at a time during the period covered by the declaration is undisputed, and it was shown that while working "he did not drink at all." Plaintiff testified that after the year 1914, "he was out of work more than he worked"; that beginning May 1, 1915, he drank more than in 1914 and so continued until his death, working at certain times or seasons, laying off and drinking the bal-

ance.  She tells of his working about three months in
the Wolverine in the fall of 1915, that he "then changed
from the Wolverine to the Tamarack during the win-
ter of 1916," and of other times and places when and
where he worked.  Had he worked the entire periods
she makes plain he was laying off during the two and
a fraction years before his death covered by the dec-
laration, he could scarcely have earned at the wages
she stated he received a total exceeding $1,000.  In
January, 1916, he was stricken with pneumonia, which
his family physician testified "was an extremely seri-
ous case," for which he attended and treated the pa-
tient during all of January, subsequently, after the
patient could visit his office, having him under his
care and office treatment until some time in April.

Bearing upon the subject of damages for injured
feelings, plaintiff's testimony shows that she had suf-
fered the shame and humiliation of a drunken hus-
band not only for many years prior to the period named
in her declaration, but some 8 years before Haanpaa
first engaged in the saloon business, in 1907.  She
states her husband began drinking in 1899 while
they were living in "Albion Location," at first being
"ashamed to come home drunk."  Like many other
miners, he at various times changed his employment
and place of residence as wages or other conditions
suggested.  He went to Butte, Montana, in 1906, re-
turning in 1908, plaintiff being there with him part
of the time.  In 1911 he went to a mining district in
Canada, where she was with him for a time, and re-
turned to the Michigan district in 1913, "a few days
after the strike started here," she then being in "Su-
perior."  He worked at the Wolverine in 1914 and
they moved to Ahmeek the latter part of April, in
1915.  She testified that while working at Ahmeek in
the spring of 1915 he got hurt and went on the sick

list "drawing from the club"; they came back from Ahmeek to Wolverine in October, and he went from the Wolverine to the Tamarack mine in the winter of 1916, was away during the summer of 1916 at Ontonagon, and during the winter of 1916 and 1917 worked at the Calumet & Hecla until February. There were no saloons in Wolverine, but Red Jacket, with a trolley line between them, was well supplied.

Kutramo was not shown to have drank in Haanpaa's place within two days of the time he met his death in a Finnish bath-house, where it is shown some of his compatriots had whisky and to which he went in an intoxicated condition on the evening of July 6th from the back door of a near-by saloon, other than Haanpaa's. Eliminating his fatal accident, for which the jury returned no damages were allowed, and making full allowance for all damages shown or claimed in material loss, of support, etc., this record is persuasive that had Kutramo met no untoward accident that day and yet lived, eliminating prospective loss and mental anguish "due to the manner and condition" in which he died, the verdict would not be for the amount shown here, and if so would be manifestly excessive.

We find it unnecessary to consider the other assignments of error, being persuaded that the incompetent testimony of plaintiff relative to "all my children" and the reiterated instructions by the court as to future losses, the condition and manner in which plaintiff's husband met his death, etc., in connection with what was said to the jury touching their answers to the special questions, are prejudicial errors reflected in the verdict.

The judgment is therefore reversed, with costs, and a new trial granted.

MOORE, C. J., and BROOKE, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.